# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**UNITED STATES OF AMERICA,**

     **Plaintiff,**

     **v.**                        **Case No. 2:23-cr-20068-HLT**

**TERRELL D. HARRISON,**

     **Defendant.**

## MEMORANDUM AND ORDER

A woman called 911 and reported that an unknown male had stolen her vehicle from an apartment complex. The woman gave conflicting accounts to dispatch but sounded distressed and could be heard screaming "[g]ive me my car" and "[g]et away from me." She then told dispatch she had her vehicle and was leaving the complex. Dispatch heard a male voice and thought a child might be involved. Officers contacted the woman in a nearby parking lot. The woman exited the vehicle she had been driving, and Defendant Terrell D. Harrison remained in the backseat. Her account of the vehicle theft continued to change during questioning, and officers detected the odor of marijuana coming from the vehicle. Officers searched the vehicle and recovered a firearm, marijuana, and paraphernalia in a backpack that had been at Defendant's feet.

Defendant moves to suppress these items as well as his DNA information and his statements to officers. He asserts a bevy of arguments that the Court resolves as follows: (1) Defendant lacks standing to challenge the search of the vehicle, (2) he has standing to challenge his seizure, but officers had adequate justification throughout the encounter to detain him, and (3) the search was lawful. The Court denies Defendant's motion.

## I.    BACKGROUND[1]

Ke'shawn Foster called 911 dispatch on August 18, 2023, around 4:40 p.m. to report that her vehicle (a white Malibu) had been stolen. Foster was in a state of distress and told dispatch that her vehicle had been taken by an unknown dark-skinned male wearing a white t-shirt at the Meadows apartment complex in Lenexa. Foster told dispatch that she was walking around outside and would head to the office, but she then began screaming, "Give me back my car! Give me my car! Cuz I'll go to jail! Give me my car! This is fuckin' retarded man."

Dispatch asked, "Is he there? Is he there?" Foster responded "I'm try'na see, hold on. Who is this? C'mon Kalani." Dispatch asked whether Foster could see a building number, and Foster eventually responded, "Apartment number 12148." Foster then screams, "Get out, you get out of my car! I'm not going up north in my car. I'm not going nowhere!"

Foster remains on the line but does not respond to dispatch's ensuing questions. Foster then yells:

> Don't touch me!
> Get away from me!
> Get away from me!
> Get away from my car!
> Get away!
> It doesn't matter, get away from me! Can you move away from my car?
> [Unintelligible] my vehicle, that's it.
> Get away from me! Get away from my car so I can go. Excuse me.

---

[1]    The Court held an evidentiary hearing on June 6, 2024. The government offered Exhibits 1-9 and the testimony of Officers Chris Cogswell, Payton Prock, Holly Ewert, and Will Andruss. The Court finds these witnesses to be credible based on their demeanor and attentiveness during questioning, their admission of facts not helpful to the government's case, and the overall internal consistency between their testimony, the body camera videos, and the other evidence. Additional facts from their testimony are included in the analysis as necessary.

Defendant offered his own testimony. The Court finds limited portions of his testimony credible (e.g., driving the vehicle in February 2023, ownership of the firearm and marijuana) and those limited portions are included when relevant. The Court does not credit his testimony about the events of August 18, 2023 based on his demeanor and because his testimony is not consistent with the recorded dispatch call, is not consistent with Foster's ultimate version of events, is at odds with other evidence, and is at odds with the account he gave to officers before and immediately after his arrest.

An unintelligible, unidentified male voice can then be heard in the background. Foster eventually says, "Okay. I'm leaving. I have stuff to do. Okay, I'm . . . going to the police station."

Dispatch tells Foster that officers are almost there and asks Foster to identify the male voice in the background. Foster says she will "wait for you all" but denies knowing him and then says, "I just want him out away from my stuff that's it." Dispatch continues talking to Foster and learns that she has her vehicle. Dispatch asks if the male left on foot, and Foster responds, "He drove off. Yeah, he left on foot." Foster then tells dispatch that she got her vehicle back and has driven away from the apartment complex. A male voice can be heard in the background, and dispatch asks Foster to identify him and whether he was the individual who had taken her vehicle. Foster identifies the male as her "baby daddy" and tells dispatch that he is not the person who had tried to take her vehicle. Dispatch urges Foster to pull over, and Foster pulls into the parking lot of a business near 85th Street and Quivira.

Officer Chris Cogswell[2] responded first to the call. Cogswell's understanding was that he was responding to a call for an attempted stolen vehicle. Dispatch had advised him that an unidentified person had attempted to take Foster's vehicle while she was still in it. Cogswell was aware that Foster had been frantic on the call and that dispatch had heard a male in the background and that there had been screaming. Cogswell had been responding to the apartment complex when dispatch informed him that a vehicle like Foster's had been seen on video leaving the apartment complex. Cogswell saw a similar vehicle exiting the apartment complex at a high rate of speed and followed it without activating his siren or lights. Cogswell verified that the vehicle he was following was Foster's. And when Foster turned off the road into the parking lot, he also pulled in.

---

[2]     Cogswell is a sergeant and has been employed by the Lenexa Police Department for 17 years. He has been on patrol for over 10 of those years.

Foster stepped out of her vehicle and approached Cogswell. Foster shut the door behind her and left the vehicle running. Foster told Cogswell that her "baby daddy" and two-year-old daughter (eventually identified as Kalani) were currently in the vehicle. The "baby daddy" was soon identified as Defendant. Foster then told Cogswell that the man who had tried to steal her vehicle did not get inside the vehicle but was just "trying to get in there." This statement contradicted what Foster had told dispatch earlier. Foster again gave a vague description of the man's clothes. She indicated her memory of the encounter was limited because she was concerned with protecting her daughter. Foster then told Cogswell that she needed to pick up her other child from school and suggested that she was in a hurry to leave. Cogswell told Foster, "Just stay right here for me," and "we're going to try to figure out what's going on real quick."

Officers Holly Ewert[3] and Jacob Wilburn then arrived on the scene. Wilburn talked with Foster. Cogswell asked Ewert to knock on the passenger-side window of the vehicle. The windows of the vehicle were darkly tinted and difficult to see through. Ewert tapped on the window with her knuckle and pantomimed a rolling down motion. The rear passenger-side window rolled down. Ewert rested her arms on the top of the rear passenger-side door and began to speak with Foster's daughter. Ewert's hands and face were partially inside of the vehicle. Ewert could smell the odor of marijuana coming from the vehicle during this interaction. Ewert asked Defendant what shirt he was wearing under his black sweater. Defendant told her that he was wearing a white t-shirt and a white tank top. Ewert reported this as well as other details she gathered from speaking to Defendant to other officers on the scene. Ewert did not report that she smelled marijuana to the other officers. Ewert explained during the hearing that she did not tell the other officers about the

---

[3] Officer Ewert has been employed by the Lenexa Police Department for over a year. She previously was employed by the Ottawa Police Department for about three years. Officer Wilburn did not testify.

odor of marijuana at that time because she and the other officers were focused on dealing with the reported vehicle theft, which was the main purpose of the original 911 call.

Defendant fit the vague description of the man Foster said tried to take her vehicle. Ewert observed that Defendant was sweating. Defendant told Ewert that Foster had picked him up ten minutes earlier. Ewert watched over Foster's daughter for the rest of the encounter, and Wilburn and Cogswell talked with Foster. Foster's statements continued to conflict with the 911 call.

Cogswell walked around to the driver side of the vehicle and knocked on the rear driver-side window where Defendant was seated. Defendant rolled the window down. Defendant explained to Cogswell that he and Foster had been dating for about a year. Defendant told Cogswell his name and that he had just been picked up from his brother's house. Defendant said that Foster had told him that someone had tried to take her vehicle and that she was on the phone with 911. Defendant told Cogswell that he had been "around the corner" during the encounter.

Cogswell then asked for Defendant's identification and explained that he and the other officers were "just trying to get everybody identified in this just to make sure everything's checking out . . . ." Cogswell explained that the events surrounding the attempted theft of Foster's vehicle were unclear and that he was trying to determine whether Defendant had been involved: "I mean it's weird that she says somebody tries to steal her car – she basically told us somebody did steal her car and then brought it back – and then she's yelling at somebody on the phone, and then when she's finally stopped you're sitting here, so we're trying to make sure you're not really involved, you know what I mean?" Defendant responded, "I just got picked up as I said." Cogswell could smell the odor of the marijuana coming from inside the vehicle while speaking to Defendant. Cogswell did not announce to Defendant or the other officers that he smelled marijuana coming from the vehicle.

Officers Will Andruss[4] and Payton Prock[5] also had arrived on the scene. Andruss walked near an open window of the vehicle a few times shortly after arriving and smelled marijuana but did not say anything about smelling it to the other officers. Andruss then spoke with Foster. Andruss pointed out to Foster the inconsistencies between what she was communicating to the officers at the scene and what she had told dispatch.

Andruss suggested to Foster that she was fabricating the vehicle theft during the 911 call and said, "Do you understand how I'm tearing down this story that you're making up because you don't want your boyfriend to get in trouble?" Andruss emphasized to Foster that it was a crime to make a false police report. And, referring to Defendant, Andruss explained to Foster the basis for his suspicion: "You give a description of the male who is trying to actively steal your car; we stop you after leaving the complex and the male that you've described is in the back seat of your car." Foster ultimately admitted to Andruss that she had been in her vehicle, that Defendant had taken her keys because he had wanted her to drive him somewhere, and that she called 911 in a panic because she did not want to take Defendant as she needed to pick up her child from school. Andruss later checked the statute for making a false police report from his police vehicle.

While Andruss was speaking to Foster, Prock indicated to Cogswell that the vehicle smelled like marijuana. Cogswell agreed but wanted to wait for the "return" on the passenger. Prock stood near Andruss, Wilburn, and Foster briefly. Prock then reapproached the driver-side of the vehicle and asked Defendant to step out. Ewert removed Kalani from the vehicle while Andruss explained to Foster that Ewert was removing Kalani because the "car smell[ed] like weed." Prock

---

[4]   Officer Andruss has been employed by the Lenexa Police Department for approximately four years. He testified that he smells marijuana on the job multiple times per week.

[5]   Officer Prock has been employed by the Lenexa Police Department for under four years. He testified that he smells marijuana on the job almost every day.

searched Defendant after getting Defendant's consent. Prock explained to Defendant that he was being detained because of the odor of marijuana coming from the vehicle. Defendant responded, "What's that got to do with me." Prock then began to search the vehicle. Prock first searched the driver's seat. He then searched the rear driver-side seat where Defendant had been sitting. Prock searched a black backpack on the floorboard where Defendant had been sitting and recovered a firearm from the bag. Prock signaled to Cogswell to arrest Defendant. Prock then approached Defendant and handcuffed him. Defendant immediately said, "That's not my gun, bro." Prock searched the bag further and discovered a bag of marijuana and a business card with Defendant's probation officer's information on it. Prock also recovered a scale and plastic baggies from the bag.

Prock arrested Defendant and put him in a police vehicle. Officers took Defendant to the police station and interviewed him. During a post-Miranda interview, Defendant denied ownership of the bag but admitted that the marijuana belonged to him. A grand jury later returned an indictment charging Defendant with possession with intent to distribute marijuana in violation of 21 U.S.C. § 841(a) and possession of a firearm in furtherance of a drug-trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A).

## II.   ANALYSIS

Defendant moves to suppress the items from the backpack as well as his DNA information and his statements to officers. He contends that the officers lacked reasonable suspicion to detain him, that the officers performed illegal searches by knocking on the vehicle's windows and intruding into its airspace, and that officers lied about smelling marijuana and therefore lacked probable cause to search Foster's vehicle. The government rebuts each argument but additionally

challenges Defendant's standing to challenge the search of the vehicle. The Court addresses the arguments below.

### A.      Fourth Amendment Standing

The government concedes that Defendant has standing to challenge his seizure but argues that he lacks standing to challenge the search of the vehicle. The outcome of this predicate issue impacts what arguments Defendant can make and which items can be suppressed. And the source of this argument is the personal nature of Fourth Amendment rights. *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978).

A defendant has a protectable privacy right under the Fourth Amendment when he has "manifested a subjective expectation of privacy in the object of the challenged search" and society is willing "to recognize that expectation as reasonable[.]" *United States v. Jefferson*, 925 F.2d 1242, 1248 (10th Cir. 1991) (internal quotation marks omitted) (quoting *California v. Ciraolo*, 476 U.S. 207, 211 (1986)). The Supreme Court discussed this test in *Rakas* and held that defendants who were passengers in a vehicle being driven by its owner at the time of the search did not have a legitimate expectation of privacy in the vehicle because the defendants asserted neither a property interest nor a possessory interest and had disclaimed any interest in the seized object. *Rakas*, 439 U.S. at 148-49.

Defendant (like the defendants in *Rakas*) has neither a property nor possessory interest in the vehicle and thus lacks standing to challenge the search of it. He did not have a property interest in Foster's vehicle because the vehicle was registered to Foster, she was on the vehicle title, and she made payments on the vehicle. They were not married, and they did not own property together. Defendant also lacked a possessory interest in the vehicle at the time of the search. Foster was driving at the time of the encounter. Foster (not Defendant) was exercising "dominion and control"

over the vehicle. *See id.* at 149. The events of the day ironically demonstrate this outcome: the entire encounter stemmed from Foster calling 911 when Defendant took her keys because he wanted to drive her vehicle to one location and she would not let him as she needed the vehicle to pick up her child. She controlled the vehicle; not him.

Defendant's attempts to show he had a possessory interest are unavailing. He claims he drove the vehicle on prior occasions without Foster being present, that he had personal property in the vehicle, and that Foster gave him control over the vehicle when she exited it to talk to the officers. The Court finds that Defendant had driven the vehicle when Foster was not present. A February 2023 traffic ticket he testified about illustrates this point. But the frequency, duration, and distance of Defendant's trips either with or without Foster in the vehicle are uncertain. And the Court does not find credible Defendant's testimony that he drove Foster's vehicle daily given his demeanor on the stand, the lack of other corroborating evidence on this issue, and the overall inconsistencies between his statements on August 18, 2023, his testimony at the hearing, and other record evidence.

Regardless, his use of Foster's vehicle on other occasions (even if frequent) and the presence of personal property (some of which he disclaimed) do not give him a lasting interest in the vehicle that is equal to Foster's. *See United States v. Dixon*, 901 F.3d 1322, 1339 (11th Cir. 2018). The Eleventh Circuit in *Dixon* rejected a similar argument and explained:

> Portela falls short of this definition because he had no legal interest in the vehicle and, at the time of the search, was a passenger with no power to control the vehicle or exclude others from it. To be sure, Portela maintains that he had "permission to use the car any time he wanted" and that he had the spare key to the car. He also asserts that he "left personal belongings in the car," paid to repair the car, and sometimes purchased gas. But these connections to the car hardly establish an interest that is grounded in "property law or . . . recognized and permitted by society." Portela did not have "exclusive custody and control" of the car when the legal owner was

> driving it and he was mere passenger. That he may have used the car
> on other occasions, even frequently, does not give him a durable
> interest in the car equivalent to that of the legal owner and driver.

*Id.* (cleaned up); *see also United States v. Eylicio-Montoya*, 70 F.3d 1158, 1162 (10th Cir. 1995)

(explaining that permission given to a passenger to operate a vehicle on prior occasions did not give the

passenger standing to challenge a subsequent search of the vehicle); *United States v. Martinez*, 983 F.2d

968, 973-74 (10th Cir. 1992) (finding a nonowner passenger did not exercise "dominion and

control" over the vehicle in which she was riding even though she had luggage in the trunk and

the vehicle's owner was not present), *overruled on other grounds by United States v. Botero-*

*Ospina*, 71 F.3d 783 (10th Cir. 1995). Like the defendant in *Dixon*, Defendant does not establish

a connection to the vehicle that justifies rights equal to a legal owner and driver.[6]

The upshot is that Defendant lacks standing to challenge the search of the vehicle.

### B.    Officers Did Not Unlawfully Seize Defendant

As already noted, Defendant has standing to challenge his seizure. *See United States v.*

*Nava-Ramirez*, 210 F.3d 1128, 1131 (10th Cir. 2000) (explaining that a defendant who lacks the

"requisite possessory or ownership interest in a vehicle to directly challenge a search of that

vehicle" may still "contest the lawfulness of his own detention and seek to suppress evidence found

in the vehicle as the fruit of an illegal detention"). But Defendant's seizure-based suppression

argument fails because he has not shown that his seizure was unlawful. *See id.* The officers had

reasonable suspicion of an actual or attempted vehicle theft at the time of the initial stop and

---

[6]    Defendant contends that his Fourth Amendment rights blossomed when Foster stepped out of the vehicle to talk
with officers. This argument is specious. This theory suggests that privacy rights spring up and extinguish
whenever the owner/driver exits and re-enters the vehicle. Like the Tenth Circuit in *Jefferson*, this Court declines
"to attribute such a chameleonic, on-again off-again, characteristic to Fourth Amendment privacy rights."
*Jefferson*, 925 F.2d at 1249 n.6.

questioning.[7] At some point, the officers also developed reasonable suspicion that Foster had made a false police report. And the officers developed probable cause of drug possession after detecting the odor of marijuana and then probable cause of drug trafficking after recovering the firearm, marijuana, and paraphernalia.

**Initial stop.** The Court starts with the initial stop. Officers had reasonable suspicion of an actual or attempted vehicle theft at the time of the stop that justified the seizure of Foster, Defendant, and Foster's minor child. *See Navarette v. California*, 572 U.S. 393, 396-97 (2014); *Arizona v. Johnson*, 555 U.S. 323, 331-32, 333-34 (2009); *United States v. Cortez*, 965 F.3d 827, 834 (10th Cir. 2020) (explaining that reasonable suspicion "accrues when an officer possesses a particularized and objective basis for suspecting criminal conduct under the totality of the circumstances" (internal citation and quotation omitted)).

Cogswell encountered Foster within minutes of her having called 911 to report that her vehicle had been stolen. Cogswell knew from dispatch that Foster had reported that a male had just taken her vehicle, Foster had screamed during the call "get out of my car" and "get away from me," Foster had not answered some of dispatch's questions, dispatch heard sounds suggesting a child was present, dispatch had heard a male voice in the background, and Foster told dispatch that she had her vehicle back. Exhibit 9 is the dispatch call log and reflects the chaotic information being given to the officers. Cogswell then encountered her vehicle leave the apartment complex at a high rate of speed and made contact with Foster in a commercial parking lot. The totality of the

---

[7] Defendant suggests that he was seized later in the encounter, when Ewert approached the vehicle and signaled to roll down the window. Defendant acknowledges, however, that he may have been seized for Fourth Amendment purposes earlier. The Court agrees with the government. Cogswell's AXON body camera shows that shortly after Foster provided Cogswell with her driver's license, she tried to end the encounter by assuring Cogswell that she no longer required assistance (that she was in possession of her vehicle) and telling Cogswell that she needed to pick up one of her children from school. Cogswell told Foster that she was not free to leave. And, as a passenger in Foster's vehicle, Defendant was seized along with her.

circumstances readily justified Cogswell's reasonable suspicion of an actual or attempted vehicle theft when Foster stopped her vehicle and Cogswell initially encountered her.

**Initial questioning.** Cogswell's reasonable suspicion continued during his initial questioning of Foster and while other officers arrived. Foster exited the vehicle and approached Cogswell. Her vehicle had darkly tinted windows. Cogswell asked her questions, and she gave vague responses that were inconsistent with her 911 call. Foster appeared flustered. She confirmed that her "baby daddy" and daughter were in the vehicle. Cogswell had not made contact with either of them at this point. Foster then seemingly tried to end the encounter by telling Cogswell that she had her vehicle back and needed to get her child from school. Cogswell told her that he was going to try to figure out what was going on and called in Foster's information. Cogswell asked Foster more questions, and she seem frustrated and agitated. Officers Ewert and Wilburn arrived, and Cogswell asked Foster to remain with them briefly.

The Court finds that Cogswell continued to have reasonable suspicion at this point based on the totality of the circumstances. He maintained reasonable suspicion of an actual or attempted vehicle theft despite Foster's insistence that she no longer needed help. Her account continued to change. She was giving vague and improbable answers against the background of a 911 call where she was heard screaming at someone to get away from her and to get away from her vehicle. She was flustered and agitated but also dismissive of the investigation. Dispatch also told Cogswell that there sounded like a child in the background and a male voice in the background. Foster confirmed that her daughter and "baby daddy" were in the vehicle, so Cogswell knew an unidentified male and minor were present although he could not see them. Cogswell had

reasonable suspicion justifying additional investigation based on the 911 call, her answers and demeanor, and the presence of an unidentified male and child whose condition were unknown.[8]

**Continued Detention and Arrest.** Cogswell's reasonable suspicion continued and expanded to include probable cause. Cogswell asked Ewert to knock on the passenger-side window for officer safety reasons and to check on the condition of the child.[9] Ewert did, the window rolled down, and Ewert at some point detected the odor of marijuana coming from the vehicle. Cogswell continued to ask Foster questions, and her answers continued to be vague and to contradict her call and other statements. Cogswell then walked around to the driver-side passenger window and knocked on it. The window rolled down, and Cogswell detected the odor of marijuana at that point. The Court credits Cogswell's testimony and finds that his detection of the odor of marijuana gave him and the other officers probable cause to believe that the vehicle contained marijuana and afforded them the ability to continue to seize and to search the vehicle. *United States v. McCormick*, 468 F.2d 68, 73-74 (10th Cir. 1972). Probable cause also meant that officers could lawfully search the vehicle and any of its containers that could contain the marijuana without regard to ownership. *Wyoming v. Houghton*, 526 U.S. 295, 307 (1999). And it was during this search that officers recovered the firearm, marijuana, and paraphernalia in the backpack that had been at Defendant's

---

[8]    The vague and internally contradictory nature of Foster's account gave rise to a separate and independent suspicion that Foster made a false report. As the encounter continued, the other officers began to express incredulity at the account Foster was giving. An investigatory seizure based on reasonable suspicion is lawful for only as long as is necessary to accomplish the stop's mission. *Rodriguez v. United States*, 575 U.S.348, 354, 357 (2015). And the stop's initial mission, here, was to investigate a possible vehicle theft. But the incoherence of Foster's explanation of what had happened gave rise to separate reasonable suspicion that Foster had falsely reported her vehicle's theft. And as is evident both from the officers' AXON body camera video footage of the encounter and from their hearing testimony, their investigation shifted in its focus from investigating a vehicle theft toward investigating a false police report. Officers can conduct an investigation unrelated to the mission of and that measurably prolongs an investigatory stop provided that the unrelated investigation is supported by independent reasonable suspicion. *Cortez*, 965 F.3d at 833-34. This happened here.

[9]    The Court credits Ewert's testimony that the tinting on the windows was very dark and that she could not see inside despite being standing very close to the vehicle.

feet. The officers had probable cause to arrest Defendant given that these items and others were recovered from this backpack. And they arrested him.

**Defendant's Indirect Challenges.** Defendant attempts to challenge his arrest by making indirect arguments on the search. Defendant can't do indirectly what he lacks standing to do directly. *See United States v. Arango*, 912 F.2d 441, 447-48 (10th Cir. 1990) (finding it unnecessary to examine the lawfulness of a vehicle search that generated probable cause to arrest because Defendant lacked Fourth Amendment standing to challenge the search); *see also* 3 W. LaFave, J. Israel, N. King & O. Kerr, Criminal Procedure § 9.4(c) (4th ed. 2023). The Court therefore does not need to address his arguments concerning whether the officers legally acquired the information they used to justify Defendant's seizure. But the Court also recognizes that this case is likely to go up on appeal and that its findings on the credibility of the officers and their detection of the odor of marijuana will be necessary should the appellate court disagree with this Court's conclusion on standing. The Court therefore briefly addresses his two arguments for completeness of the record.

<u>Window Knocks.</u> Defendant first argues that officers detected the odor of marijuana when Ewert unlawfully searched the vehicle by knocking on the widow. This argument relies on the trespass-based view of the Fourth Amendment described in *United States v. Jones*, 565 U.S. 400 (2012). *Jones* explained that a search occurs when there is a common law trespass plus "an attempt to find something or obtain information." *Id.* at 408 n.5. Defendant relies heavily on *Taylor v. City of Saginaw*, 922 F.3d 328, 332-33 (6th Cir. 2019), and *United States v. Richmond*, 915 F.3d 352, 358 (5th Cir. 2019), in which courts found that the external physical manipulation of certain objects constituted Fourth Amendment searches under a trespass-based view.

But this case is distinct from those cases because Ewert's knock (like Cogswell's knock) was not done in "an attempt to find something or obtain information" directly.[10] *See United States v. Anderson*, 658 F. Supp. 3d 1000, 1014 (D. Kan. 2023) ("The cases finding a trespass-based search under the *Jones* standard all involved circumstances in which information was gained <u>directly</u> through the trespass." (emphasis added)); *see also United States v. Zabokrtsky*, 2020 WL 1082583, at *6 (D. Kan. 2020) (discussing *Richmond* and concluding that no search occurred when an officer physically touched defendant's vehicle). The knocks in this case were done to gain the attention of the passengers remaining in the vehicle. And seeking to gain the attention of a person on the other side of a window is not an attempt to obtain information from the window (just like knocking on the door of a house to get someone to answer is not an attempt to obtain information from the door).[11] Cogswell and Ewert's window-knocks were therefore not searches in this case.[12]

---

[10]  The Court takes no view on whether the window-knocks would have been considered common law trespasses to chattel property at common law. Courts post-*Jones* have observed that a claim for trespass to chattels required less at the time of the founding than it does under modern tort law. *United States v. Ackerman*, 831 F.3d 1292, 1307 (10th Cir. 2016) (Gorsuch, J.). At the time, "a suit for trespass to chattels could be maintained if there was a violation of the dignitary interest" in the chattels' "inviolability." *Id.* (quoting *Jones*, 565 U.S. at 419 n.2. (Alito, J., concurring in the judgment)). And "the necessity of some actual damage to the chattel" was not required. W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser & Keeton on the Law of Torts 87 (5th ed. 1984). But the Court need not determine in this case whether the old writ of trespass to chattels would have prohibited knocking on a window.

[11]  A "knock-and-talk" is an encounter "during which police officers knock on the door of a home seeking to speak with the occupants . . . ." *United States v. Carloss*, 818 F.3d 988, 992 (10th Cir. 2016). The Tenth Circuit has held that this investigatory practice does not even require reasonable suspicion let alone probable cause. *See United States v. Cruz-Mendez*, 467 F.3d 1260, 1264-65 (10th Cir. 2006).

[12]  Defendant additionally argues that Ewert committed a Fourth Amendment violation when she intruded into the vehicle's airspace. Defendant is likely correct that Ewert's intrusion into the vehicle's airspace was a search for Fourth Amendment purposes. *See United States v. Montes-Ramos*, 347 F. App'x. 383, 389-90 (10th Cir. 2009); *United States v. Otero*, 2023 WL 5336714, at *6-7 (D. Kan. 2023). But this is of no consequence, here, because there is no causal connection between her intrusion and the subsequent search of the chattel. Ewert's intrusion occurred after the rear passenger-side window was rolled down, and it did not taint either Prock, Andruss, or Cogswell's independent detection of marijuana from the vehicle. Put another way, there was a source independent of Ewert's trespass for the marijuana's smell. *United States v. Forbes*, 528 F.3d 1273, 1280 (10th Cir. 2008).

Odor of Marijuana. Defendant next argues that the officers lied about smelling marijuana. He explains that it is highly unlikely that the officers detected the odor of marijuana outside Foster's vehicle because the "small" amount of marijuana was in a plastic bag tucked into his backpack. Defendant also supports this argument by noting that there is little officer commentary until late into the encounter about the smell of marijuana and that there are portions of the AXON body camera videos where officers muted their camera and could have conspired to lie about the odor of marijuana.

Defendant makes bold arguments with very little support. The amount of marijuana was not "small." It was a substantial amount in a bulging plastic bag. *Cf. United States v. Pittman*, 782 F. App'x. 663, 665-67 (10th Cir. 2019) (affirming the district court's conclusion that a police officer outside defendant's vehicle and could smell marijuana contained in sealed bags inside a backpack). And the officers credibly and independently testified that they detected the odor of marijuana. Cogswell, Andruss, Prock, and Ewert testified that they could smell marijuana coming from the vehicle when the windows were rolled down.[13] These officers were familiar with the odor of marijuana based on their training and experience. And, notably, Defendant never contradicted Prock when Prock noted the odor of marijuana as the basis for the search. Defendant instead simply asks Prock how it concerns him.

The Court is unconcerned about the lack of discussion among the officers about the smell until later in the encounter. There is no requirement that officers make a contemporaneous note for the benefit of body camera footage about the smell of marijuana to combat later claims that they fabricated the smell. *See, e.g., id.* at 667 (noting the absence of authority requiring officers to annotate their investigative steps). Indeed, Ewert and Prock explained at the hearing that the

---

[13] Ewert could not recall whether the marijuana smell coming from Foster's vehicle was that of "fresh" marijuana or "burned" marijuana.

detection of marijuana was a secondary concern to them because their chief priority was to investigate the 911 report of a stolen vehicle.

The Court is also not troubled by the muting of the AXON body cameras in this case. The officers did mute their audio at various points. But most of the time another officer was still recording audio during the salient discussions. For example, Cogswell is recording audio during his conversation with Prock immediately before the search and during which Prock notes the odor of marijuana. Stated differently, the Court can hear their discussion and there is nothing nefarious. Cogswell agrees that the vehicle smells like marijuana. The notion that officers fabricated the odor is further undercut by Ewert's audio, which was recording throughout the encounter. She expressed no surprise when she asked Prock if he was going to start searching the vehicle. And Andruss, who was talking to Foster when Cogswell and Prock discussed searching the vehicle and who was not part of their conversation, similarly expressed no surprise when Ewert removed Foster's daughter from the vehicle. He contemporaneously explained to Foster matter-of-factly that her daughter was being removed because the vehicle smelled like marijuana. Indeed, most of the muting does not occur until after officers searched the vehicle. Defendant's indirect challenges thus fail.

## III. CONCLUSION

The Court finds that Defendant lacks standing to challenge the search of Foster's vehicle and that his seizure did not violate the Fourth Amendment. His other arguments, although perhaps unnecessary to resolve, are similarly unavailing. The Court denies Defendant's motion to suppress.

THE COURT THEREFORE ORDERS that Defendant's motion (Doc. 22) is denied.

IT IS SO ORDERED.

Dated: July 8, 2024

/s/ Holly L. Teeter
HOLLY L. TEETER
UNITED STATES DISTRICT JUDGE